IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In Re: ) | |
| ) | |
| CHARLES WAYNE ROWLES and ) | |
| JULIE ANN ROWLES, ) | Case No. 08-21567-DRD-7 |
| ) | |
| Debtors. ) | |
| ) | |
| THE BANK OF OTTERVILLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary Proceeding No. 09-2032 |
| ) | |
| CHARLES WAYNE ROWLES and ) | |
| JULIE ANN ROWLES, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

The matter before the Court is the complaint filed by Plaintiff, The Bank of Otterville ("Bank") against Defendants-Debtors, Charles Wayne Rowles and Julie Ann Rowles ("Debtors") in which the Bank seeks a determination that its claims against the Debtors are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) or (a)(2)(B) on the grounds that the Debtors provided to the Bank a materially false financial statement with the intent to deceive the Bank in extending or refinancing credit. This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and (b). This is a core proceeding which the Court may hear and determine pursuant to 28 U.S.C. §§ 157(b)(2)(I). This Memorandum Opinion contains my Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure as made applicable to this matter by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For all the reasons set forth below, the

Court finds Debtors' debt to the Bank nondischargeable pursuant to § 523(a)(2)(B).[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

The lending relationship between the Debtors and the Bank began sometime in 2005 when the Debtors approached the Bank for the purpose of financing the acquisition of a manufactured home to be placed on real property they owned. To secure the loan, the Bank took a lien on the real property. The Debtors made the payments on this loan until defaulting shortly before the filing of their Chapter 7 bankruptcy proceeding. The Bank sought and obtained relief from the automatic stay and foreclosed on the real property. The Bank does not contend that the remaining indebtedness on this note is nondischargeable and the circumstances of this lending are not directly relevant to the claims presently before the Court.

The Debtors and the Bank next entered into business relations in connection with a loan sought in May 2006 in the amount of $103,114.50 for the purpose of refinancing an indebtedness to Commerce Bank in the amount of approximately $67,000.00 and financing the purchase of a truck for approximately $30,000.00. The loan was to mature in March 2007 and was secured by a security agreement in which the Debtors granted the Bank a security interest in the truck, another vehicle and miscellaneous farm equipment including: a 2003 Yamaha four-wheeler, a 1987 Ford 7710 cab tractor, a 1974 Ford 7000 tractor, a Dunham-Lier Model 22 loader, a Vermeer Model 605J baler, a Vermeer Model WR-20 hay rake, a John Deere Model 270 nine foot disc mower, a Model 471 New Holland sickle mower, 24 corral panels, a homemade hay trailer, a Model 7030 Vermeer nine

---

[1] In the complaint, the Bank appears to request determinations of nondischargeability under both § 523(a)(2)(A) for fraud, false representation or false pretenses and under § 523(a)(2)(B) for extending or refinancing credit pursuant to a false financial statement. The claims are, however, mutually exclusive. *First Nat'l Bank of Olathe, Kansas v. Pontow (In re Pontow)*, 111 F.3d 604, 608 (8th Cir. 1997). Since this Court finds the claims nondischargeable under § 523(a)(2)(B), it must deny the Bank's claims under § 523(a)(2)(A).

foot disc mower and a 1999 Yamaha Grizzly 4-wheeler. The Debtors had previously executed a security agreement, dated August 29, 2005, granting the Bank a security interest in a 1997 Coose stock trailer. On March 31, 2007, the balance of the note, at that time just over $100,000.00, was refinanced for a period of approximately one year, to mature March 8, 2008. It was secured by the items described in the previously executed security agreements.

At the time the original loan was made in May 2006, the Debtors provided the Bank with a financing statement in which they listed their assets and liabilities. Among the assets listed were the items of farm equipment identified in the May 2006 and August 2005 security agreements. In addition to requesting a description of the items of property, their costs and alleged market value, the financial statement form also asks for the Debtors' percentage ownership in each listed item. In each case, that column was filled in with the number 100, indicating the Debtors claimed complete ownership of the equipment.

Subsequently, the Bank loaned additional funds in small amounts pursuant to separate promissory notes executed either by the Debtors jointly or Debtor Julie Rowles individually. Each note was secured by the same collateral, the items listed in the earlier security agreements and financial statement.

During the bankruptcy proceeding, the Bank also sought relief from the automatic stay to repossess and liquidate the vehicles and farm equipment. In that process, the mother of Debtor Charles Rowles intervened asserting ownership of several of the items of listed equipment. The Bank received relief from the automatic stay as to certain of its collateral and initiated a replevin proceeding against Marilyn Rowles to obtain the remaining items. The Bank subsequently dismissed that proceeding after being convinced pursuant to her sworn testimony and documentary evidence she produced that she in fact owned the equipment in question and that the Debtors had

no authorization to pledge it to the Bank on their indebtedness. This complaint followed.

The Bank contends that its remaining claims against the Debtors are nondischargeable because the Debtors obtained an extension, renewal or refinancing of their credit by submitting to the Bank a financial statement which was false in that it asserted ownership in property they purported to pledge as collateral which they did not own. The financial statement was materially false in that the items in question formed a significant percentage of the collateral being pledged to secure the loan. The Bank further contends that the Debtors knew that the financial statement was false or had no basis for asserting a claim of ownership and had no authority from the real owner to pledge the collateral. The Bank contends that it would not have made the loans if that collateral had not been available to it and had it known of a competing claim to an interest in the collateral it would have sought permission from the owner to pledge the collateral to secure the debt or declined to make the loans. Although the Debtors appear to suggest that the Bank did not reasonably rely on the financial statements, their primary contention is that they did not publish the financial statements with intent to deceive.

## II. DISCUSSION

In order to establish that a claim is nondischargeable pursuant to § 523(a)(2)(B), the creditor must demonstrate that the debtor obtained an extension, renewal or refinancing of credit by: (1) a written statement; (2) that it is materially false; (3) regarding the debtor's (or an insider's) financial condition; (4) on which the creditor reasonably relied; and (5) that the debtor caused to be made or published with intent to deceive. *First National Bank of Olathe, Kansas v. Pontow (In re Pontow)*, 111 F.3d 604 (8th Cir. 1997); *Teachers Credit Union v. Johnson (In re Johnson)*, 131 B.R. 848 (W.D. Mo. 1991); *Rosen's, Inc. v. Ghere (In re Ghere)*, 393 B.R. 209 (Bankr. W.D. Mo. 2008); *The Heritage Bank of St. Joseph v. Bohr (In re Bohr)*, 271 B.R. 162 (Bankr. W.D. Mo. 2001). The

4

burden is on the claimant to establish each of these elements by a preponderance of the evidence. *Pontow*, 111 F.3d at 608; *Ghere*, 393 B.R. at 214; *Bohr*, 271 B.R. at 166. A financial statement is materially false if it paints a substantially untruthful picture of the debtor's financial condition by means of misrepresentation of a type which would normally affect the decision to grant credit, it falsely represents the overall financial condition of the debtor or has major omissions. *Bohr*, 271 B.R. at 167; *Kunzler v. Bundy (In re Bundy)*, 95 B.R. 1004, 1008 (Bankr. W.D. Mo. 1989) (materially false statement is one that is substantially inaccurate); *Capital City Bank & Trust v. Kroh (In re Kroh)*, 89 B.R. 808, 814 (Bankr. W.D. Mo. 1988) (statement is materially false if it is false representation of overall financial condition of debtor). The plaintiff must demonstrate both that it actually relied upon the false financial statement and that its reliance was reasonable under the circumstances. *Johnson*, 131 B.R. at 854. Partial reliance is all that is necessary; the financial statement need only be a contributing cause to the decision to extend credit. *Johnson*, 131 B.R. at 854. The reasonableness of the creditor's reliance on the financial statement is based on an assessment of the totality of the circumstances. *Pontow*, 111 F.3d at 610; *Ghere*, 393 B.R. at 216; *Bohr*, 271 B.R. at 168; *Bundy,* 95 B.R. at 1009. Reasonableness is an objective standard, that of a reasonably prudent person. *Bundy*, 95 B.R. at 1009. The creditor need only employ its standard business practices, *Capital City*, 89 B.R. at 814, and is under no duty to conduct an independent investigation of the facts. *Earls v. Southgate Bank and Trust Company (In re Earls)*, 80 B.R. 978, 980 (W.D. Mo. 1987); *Ghere*, 393 B.R. at 216; *Bundy*, 95 B.R. at 1010; *Capital City*, 89 B.R. at 814, *Norbank v. Kroh (In re Kroh)*, 87 B.R. 1004, 1008 (Bankr. W.D. Mo. 1988). The creditor may rely upon the financial statement if there are no "red flags" or other irregularities suggesting the need for additional inquiry. *Pontow*, 111 F.3d at 610; *Ghere*, 393 B.R. at 216; *Capital City*, 89 B.R. at 815.

The debtor may be guilty of publishing a statement with intent to deceive without having a

malignant heart; no actual malice is required. *Ghere*, 393 B.R. at 215; *Bohr*, 271 B.R. at 169. Because direct evidence of such intent is often absent, it may be inferred from the circumstances. *Ghere*, 393 B.R. at 215; *Capital City*, 89 B.R. at 816. The debtor publishes a false statement with intent to deceive if he knew the statement was false or acted in reckless disregard of the truth. *Ghere*, 393 B.R. at 215; *Bohr*, 271 B.R. at 169; *Norbank*, 87 B.R. at 1008. The debtor cannot overcome an inference of intent to deceive merely with unsupported assertions of honest intent. *Ghere*, 393 B.R. at 215; *Bohr*, 271 B.R. at 169.

About most of the elements of the nondischargeability claim there is no dispute. For example, there is no question that the Debtors obtained from the Bank numerous extensions, renewals or refinances of credit. The Debtors borrowed money from the Bank on several occasions as evidenced by the numerous promissory notes in evidence, at least one of which was renewed. There is also no dispute that the Debtors submitted to the Bank a written statement concerning their financial condition. The financial statement accompanying the May 2006 borrowing included a comprehensive statement of the Debtors' financial condition listing their various assets and liabilities. Likewise, there is no significant dispute that the financial statement was false. The statement asserted the Debtors had 100% ownership in the various items of farm machinery and other equipment listed on page 4 of the financial statement. Although the Debtors claim to have believed that they had a 100% ownership in these items of equipment (which the Court will discuss in detail below) they made no serious effort to demonstrate that they did in fact own the equipment to the exclusion of any other interest. Although there is a hint in the testimony of an argument that the Debtors may claim to have been in partnership with Debtor Charles Rowles' parents and acquired an interest in the equipment by reason of that partnership or that there was a joint ownership in the machinery and equipment as a result of that relationship, even if true, this would

still make the representations in the financial statement false. The testimony of Marilyn Rowles, Charles' mother, introduced by deposition, makes clear that she unequivocally denied any assertion that there was a partnership involving her, her deceased husband and the Debtors, or that Debtors had any joint interest in the equipment. Certain documents introduced into evidence also indicate the acquisition of and payment for the equipment by Charles' parents.

Debtors also do not appear to dispute that the financial statement was *materially* false. The original and renewal extension of credit on the farm machinery and equipment was secured by the various items listed on Schedule H of the financial statement. That schedule is divided into two categories: one for machinery and equipment subject to a certificate of title; the other for equipment not so titled. The total ascribed value of the machinery and equipment in both categories is $80,950.00. In addition, the loan was secured by the truck being acquired with the new advance made. The present dispute centers on six items of equipment, ascribed a value of $43,550.00, a significant percentage of the value of the machinery and equipment posted as collateral for the loan. Accordingly, the Court concludes that the misrepresentations are material.

The dispute among the parties centers primarily upon whether the Debtors published the financial statement with intent to deceive, although the Debtors apparently also argue that the Bank has not demonstrated actual or reasonable reliance upon the financial statement. Accordingly, the Court will address that issue as well.

A Bank officer testified that the loans would not have been made but for the collateral offered in the security agreements and listed on the financial statement. His testimony was that the Debtors did not have enough other income or sufficient additional collateral to justify the extensions or renewals of credit involved. Moreover, he testified that had the Bank known at the time the notes were executed that someone else claimed an interest in the collateral, the Bank would either not have

made the loans or would have insisted that others with an interest in the property execute appropriate documentation pledging their interest in the collateral to repayment of the loan. This testimony is uncontradicted and the Court finds it credible. The Debtors appear to argue that the value of the collateral pledged does not equal the amount of the loan and that the Bank therefore apparently knew that it was making an unsecured loan. As the Bank points out in its post-trial submission, in making this argument the Debtors have failed to take into consideration the value of the additional vehicle purchased with the loan proceeds and also pledged as collateral. The Debtors also overlooked the testimony of the bank officer that he made an independent assessment of the value of the collateral and determined that it was sufficient for the amount of the loan extended.

The Court also finds that the Bank's reliance was reasonable under the circumstances. There was no indication of another ownership interest in the collateral at the time the loans were made or renewed. The bank officer testified that the first information he had about a potential other ownership interest in the collateral was when Marilyn Rowles intervened in the bankruptcy proceeding when the Bank filed its motion for relief from automatic stay. As noted above, the Bank had no duty to conduct an independent investigation, unless there were some indication of irregularity. The Court finds there was none in this instance. As indicated by the evidence, the Bank had a prior relationship with the Debtors on a real estate loan during which it encountered no problems. Much, if not all, of the collateral at issue is not subject to state certificate of title legislation. Accordingly, it would not have been possible to check state records to confirm the way in which the machinery was titled. The Bank did perform a Uniform Commercial Code records search and found no prior liens on the equipment filed in the name of the Debtors.

As noted above, the principal issue between the parties relates to whether the Debtors published the financial statement with intent to deceive the Bank. The Debtors assert they had a

reasonable good faith belief that they had a 100% ownership interest in the property. The Court finds this assertion not to be credible. Because their situations are different, the Court must assess the evidence separately with respect to each of the Debtor-Defendants.

For some time, Charles apparently participated in his parent's farming operation and ran his cattle on their land, using some of their equipment in the process. In June 1993, Charles and his parents entered into a written agreement specifying the nature of their relationship with regard to that farming operation and specifically confirming the ownership interests in the various cattle and items of machinery equipment used in that operation. The agreement was apparently executed at a time during which Mr. Rowles was involved in a dissolution proceeding with a prior spouse who asserted an ownership interest in certain cattle and seized it to satisfy his marital obligations. In order to avoid additional problems, Charles and his parents entered into the agreement introduced into evidence specifying the terms of the relationship. Among other things, it clearly states that Charles had no ownership interest whatsoever in machinery and equipment owned by his parents. Among the specific items of equipment listed in the agreement as part of that acknowledgment is the Model 7000 Ford tractor, one of the six items at issue here. Paragraph 5 of the agreement also acknowledges that while Charles had provided labor with regard to caring for his parents' livestock, he did not as a result acquire any ownership interest in the livestock or machinery owned by his parents. This agreement clearly belies any joint ownership interest for Charles Rowles in the equipment at issue. Charles claims at the time he executed the financial statement for renewal of credit with the Bank, he did not recall that he had entered into this agreement with his parents. The Court finds that testimony not credible under the circumstances. The agreement was entered into during a period when Charles was engaged in a dispute with a prior spouse who had seized property that his parents claimed to own. A dissolution itself is a significant life event, let alone one as

eventful or disruptive as this one apparently was. So too would be sitting down with one's parents and entering into a written agreement specifying the nature of the relationship and the ownership of assets used in the course of that relationship. It is simply not credible to assert that at the time he executed the financial statement, Mr. Rowles forgot that he had executed this document.

In addition, his testimony at trial and at his deposition were both inconsistent with the claim of 100% ownership, which further undermines his credibility. Apparently, at his deposition, he changed his position and asserted a 50% ownership interest in the equipment rather than complete ownership. Even were that the case, his financial statement would still have been false. He testified at trial that he understood that the farm and machinery "were to be" his. Clearly this reflects a belief that he would acquire ownership of the property on the death of his parents, not that he had any present ownership. He claims no interest in the real estate currently owned by his mother. How he would have obtained an interest in the machinery during her lifetime is unclear. He offers no basis whatsoever for his assertion of a belief in joint ownership of the equipment, let alone complete ownership. Any such belief is unequivocally contradicted by the terms of his written agreement with his parents and his mother's testimony denying any partnership or joint interest.

The situation is somewhat different as to Debtor Julie Ann Rowles, although the Court draws the same conclusion. She testified that before she executed her first joint tax return with Charles, she saw a previous tax return in which Charles and his ex-spouse were treated as 100% owners of the machinery in question and took full depreciation allowances on the equipment. She claims she had conversations both with an accountant and with Charles' father about this and came away with the "impression" that Debtors owned the equipment. No details of these conversations are offered, and the tax returns were not admitted into evidence. Accordingly, she has demonstrated no basis for her alleged belief in complete ownership of the machinery and equipment. She testified that the

10

financial statement was completed in her handwriting and that she had a question about the meaning of the numbers placed in the ownership column, confused as to whether they indicated the interest of the Debtors in the collateral or the potential interest of the Bank in the collateral after execution of the security agreement. The Court does not believe that the language of the financial statement or the security documents bears that interpretation. What the evidence does show is that her attention was specifically drawn to the ownership percentage column in the financial statement. Having been thus focused on this issue, it was incumbent upon her to supply accurate information and to resolve any concerns she may have had. Failure to do so and to merely asserting complete ownership of the equipment without sufficient basis is at least reckless disregard for the truth.

If the Court had any doubt on the question, it was put to rest when plaintiff introduced evidence of the personal property tax returns filed by the Debtors for the years 2004 through and including 2009, prepared by Debtor Julie Ann Rowles. The form contains a specific section for inclusion of farm machinery and equipment. On none of these tax forms did she list ownership of any such equipment. Accordingly, during the same period of time she claims that these items were listed on her tax returns (which she did not introduce into evidence) with depreciation taken, she did not claim ownership of these items or pay taxes on them to the county. Failure to do so belies her current assertion that at the time she executed the financial statement offered to the Bank that she reasonably and in good faith believed that she and her husband had 100% ownership interest in the items of machinery offered as collateral.

Accordingly, the Court finds the indebtedness remaining owed to the Bank on the notes due and unpaid is nondischargeable pursuant to § 523(a)(2)(B) as having been obtained as a result of the issuance of a materially false statement in writing regarding the Debtors' financial condition upon which the Bank reasonably relied and which was published by the Debtors with intent to deceive.

11

As noted above, although some of the notes in question were executed jointly by both Debtors, some were executed solely by Debtor Julie Ann Rowles. In its post-trial submission, the Bank seeks a judgment against both Debtors on all notes claiming that Debtor Charles Rowles received the benefit of some of the extensions of credit evidenced by the notes executed by Julie alone. The Bank offered no evidence at trial to support these assertions and offers no legal authority for ascribing liability to Charles on the notes signed solely by Julie. Accordingly, the Bank's request in that regard is denied. According to the business records admitted into evidence by the Bank, the balance due as of the date of trial on the notes executed by both Debtors is $92,098.75, and the Court grants judgment against both Debtors in that amount. According to the evidence, the balance due as of the time of trial on the four notes executed solely by Debtor Julie Ann Rowles was $23,753.57, and the Court grants judgment against Debtor Julie Ann Rowles in that amount.

In addition, each of the notes executed by the Debtors in favor of the Bank contains a provision authorizing the Bank to recover its reasonable costs of collection, including attorney's fees. Accordingly, the Bank may add to the amount of its damages the amount of attorney's fees incurred in attempting to collect these balances and that amount is also nondischargeable. *Bohr*, 271 B.R. at 169. The Bank submitted an affidavit in support of its claim for attorney's fees requesting an allowance of $14,600.00 in fees and $762.94 in expenses to be added to the claim. The Court has examined the affidavit and supporting fee statements and finds the amount claimed reasonable subject to certain adjustments. In two instances, July 2, 2009, and February 20, 2010, counsel lists time which includes travel from St. Louis to Columbia or Jefferson City, Missouri, and bills for the entire amount of such time. This Court has previously held that travel time is to be allowed at half counsel's regular rate unless work is performed en route. *In re Vantage Investments*, 328 B.R. 137, 145 (Bankr. W.D. Mo. 2005). Since there is no indication that that was done in this instance, the

Court adjusts those time entries accordingly, imputing two hours travel time (one way) and reduces those entries by four hours in the aggregate, resulting in a reduction of $800.00 in fees. In addition, on both July 17, 2009, and July 20, 2009, time is billed for responding to a subpoena by a prosecutor for Bank files. The Court does not believe that that time was expended in collecting amounts due from the Debtors and therefore will delete the three-quarters of an hour expended in these tasks, resulting in a reduction of $150 in the fees sought. The statements reflect that on the day before trial, Bank's counsel expended a total of nine hours in preparation. The Court believes that under the circumstances, considering this was a relatively uncomplicated and focused dispute, that the preparation could reasonably have been done in less time. Accordingly, the Court will reduce that entry by 25% effecting another reduction of $450 in the fees claimed. Finally, the statements also show that a total of 11 hours was expended in the preparation and submission of a post-trial brief. While that brief was succinct and helpful, again, the Court believes that a lesser amount of time would probably have sufficed. The brief is only eight pages long and basically did not require any significant legal research (only four cases are cited) as there were no novel issues of law involved. The Court will make the same 25% reduction in the fees asserted for preparation of the post-trial brief resulting in a final adjustment of $550 in the amount sought. Accordingly, the Court grants judgment against both Defendants in the sum of $13,412.94 for attorney's fees and costs incurred.

     A separate order will be entered in accordance with Rule 9021.

DATED:    February 24, 2010                    /s/ Dennis R. Dow
                                                      HONORABLE DENNIS R. DOW
                                                      UNITED STATES BANKRUPTCY JUDGE

Copies to:
Scott M. McKinnis, Esq.
Philip D. Sachs, Esq.